# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| FISHBACK NURSERY, INC. and<br>SURFACE NURSERY, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:16-CV-03267-B |
| | § | |
| PNC BANK, N.A. and<br>CRYSTAL FINANCIAL, LLC, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

This case comes to the Court in the aftermath of a bankruptcy proceeding. The parties claim interests in the same property of now-bankrupt BNF Operations LLC (BNF). PNC asserts a lien over substantially all of BNF's assets because of loans it made to BNF, and Fishback Nurseries and Surface Nurseries (the Nurseries) assert liens over agricultural products they sold BNF. Although PNC has already received and liquidated BNF's assets, the Nurseries contend that the bankruptcy court's final order entitles them to a portion of the proceeds because their liens are senior to PNC's and enforceable. PNC claims the opposite. Now, both the Nurseries and PNC have moved for summary judgment. Finding the nurseries to lack senior, enforceable liens, the Court **DENIES** the Nurseries' motion and **GRANTS** PNC's.

# I.

# BACKGROUND

A.    *Factual History*[1]

The Nurseries and PNC are creditors of now-bankrupt BNF Operations LLC (BNF). The Nurseries are BNF's creditors because they sold agricultural products to BNF and took security interests in those products. Fishback Nursery shipped agricultural products to BNF in Oregon, Michigan, and Tennessee. Doc. 29-1, Stipulation, Ex. 1; Doc. 29-2, Stipulation, Ex. 2; Doc. 29-3, Stipulation, Ex. 3. Payment was originally due on these orders on their invoice dates and finally due ninety days after the invoice dates. *Id.* Fishback filed a Uniform Commercial Code financing statement[2] for the Oregon order with the Oregon Secretary of State on June 21, 2016. Doc. 29-1, Stipulation, Ex. 1. Fishback filed a UCC financing on the same date with the Michigan Secretary of State for the Michigan orders. Doc. 29-2, Stipulation, Ex. 2. And Fishback filed with the Tennessee Secretary of State a UCC financing statement for the Tennessee orders on June 28, 2016. Doc. 29-3, Stipulation, Ex. 3. All three financing statements listed the debtor's name as "BFN Operations, LLC abn Zelenka Farms." Doc. 29-1, Stipulation, Ex. 1; Doc. 29-2, Stipulation, Ex. 2; Doc. 29-3, Stipulation, Ex. 3. But BFN's founding documents list its name as "BFN Operations LLC." Doc. 35-19, App'x to PNC's Mot. Summ. J., 444–45. Fishback filed also a notice of lien with the Oregon Secretary of State for all orders on August 29, 2016. Doc. 29-9, Stipulation, Ex. 9A; Doc. 29-10,

---

[1] This factual history is drawn from the facts to which the parties have stipulated.

[2] The UCC, which many states have adopted, usually requires creditors in secured transaction to file financing statements, which describe the debtor and the collateral securing the transaction. Mich. Comp. Laws § 440.9310(1); Tenn. Code Ann. § 47-9-301(a); Or. Rev. Stat. § 79.0502.

Stipulation, Ex. 9B; Doc. 29-11, Stipulation, Ex. 9C. In all, Fishback demands $1,178,831.44. Doc. 29-1, Stipulation, Ex. 1; Doc. 29-2, Stipulation, Ex. 2; Doc. 29-3, Stipulation, Ex. 3.

Surface Nursery shipped goods to BNF only in Michigan. Doc. 29-4, Stipulation, Ex. 4. Surface tendered the invoices on March 3, 2016, and payment became finally due June 1, 2016. *Id.* Surface filed a UCC financing statement with the Michigan Secretary of State on June 28, 2016, *id.,* and a notice of lien with the Oregon Secretary of State on July 13, 2016, Doc. 29-12, Stipulation, Ex. 10. Surface's financing statement also lists the debtor's name as "BNF Operations, LLC abn Zelenka Farms." Doc. 29-4, Stipulation, Ex. 4. In all, Surface demands $262,677.26. *Id.*

PNC is BNF's creditor because PNC loaned BNF money and took a security interest in substantially all of BNF's assets. Doc. 29-15, Stipulation, Ex. 13.

On June 17, 2016, BNF filed for bankruptcy in the Northern District of Texas. Doc. 29, Stipulation, ¶ 7. During the bankruptcy proceedings and with the bankruptcy court's approval, PNC provided debtor-in-possession (DIP) financing to BNF so that BNF could stay in business during the bankruptcy proceedings. *Id.* at ¶¶ 43–44. The DIP financing was in addition to the prepetition loans PNC made to BNF. The bankruptcy court ordered that PNC's prepetition loan to BNF would be considered part of the DIP financing and ordered that PNC's DIP Lien

> shall be a first priority senior and priming lien on the DIP collateral (including the pre-petition collateral), subject and junior only to . . . valid, enforceable, properly perfected, and unavoidable pre-petition liens that are senior to the liens granted to Pre-Petition Lenders, Pre-Petition Agent, and Term Loan Agent pursuant to the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents.

Doc. 29-16, Stipulation, Ex. 14.

Seeking to capitalize on the above order of the bankruptcy court, the Nurseries filed this lawsuit on November 21, 2016, Doc. 1, Compl., and an amended complaint on February 6, 2017, Doc. 16, Am. Compl. The Nurseries seek a declaratory judgment that they have "valid, enforceable, properly-perfected, unavoidable prepetition liens" senior to PNC's DIP lien, and the Nurseries ask the Court to order PNC to turn over money to satisfy their allegedly senior lien. *Id.* at ¶¶ 14–19. PNC counterclaims for a declaratory judgment that the Nurseries lack senior and enforceable liens. Doc. 18, Answer & Countercl., ¶¶ 25–34. On August 28, 2017, both the Nurseries and PNC filed motions for summary judgment, which the Court will now resolve. Doc. 30, Nurseries' Mot. Summ J.; Doc. 33, PNC's Mot. Summ. J.

## II.

## LEGAL STANDARD

Courts must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, no facts are in dispute.

## III.

## ANALYSIS

The only issue in this case is whether, as a matter of law, the Nurseries have valid, enforceable, properly perfected, and unavoidable pre-petition liens senior to the Banks' DIP lien. The parties agree on the facts but not the law. Whereas the Nurseries argue that Oregon law determines who has the senior lien, the Banks contend Michigan and Tennessee law apply to property BNF received in those states. The parties disagree also on whether the Nurseries have senior liens under

Oregon law.[3] The Court will first resolve the choice-of-law issue, explaining that this lien dispute is governed by the laws of the states in which BNF received products from the Nurseries. Second, the Court will apply the appropriate states' laws to determine whether the Nurseries have enforceable, senior liens.

*A. Choice of Law*

The Court will first determine what states' laws govern this lien dispute. Relevant to the choice-of-law question is why the Court has subject matter jurisdiction over this case. The Nurseries pleaded diversity jurisdiction in their Amended Complaint. Doc. 16, Am. Compl., ¶ 5. If the Court is sitting in diversity, Texas law determines what choice-of-law principles apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). But although the Nurseries have pleaded diversity jurisdiction, they have not pleaded facts supporting diversity jurisdiction. Whether the Court has diversity jurisdiction, though, it certainly has jurisdiction under 28 U.S.C. § 1334(b) because this case is "related to" a bankruptcy proceeding. *See* 28 U.S.C. § 1334(b) ("[T]he district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under [the Bankruptcy Code], or arising in or related to cases under [the Bankruptcy Code]."). Indeed, the Nurseries's claim hinges on the final order of a bankruptcy court.

What choice-of-law principles govern in bankruptcy cases is an open question. Although the bankruptcy laws rely on state law for definitions of many rights important in bankruptcy proceedings, the Bankruptcy Code provides no method for resolving conflicts of state law. *In Re SMEC, Inc.*, 160 B.R. 86, 89 (M.D. Tenn. 1993). The Fifth Circuit has not determined whether courts exercising

---

[3] Given the outcome of the choice-of-law analysis, the Court will not apply Oregon law to property BNF received in Michigan and Tennessee.

bankruptcy jurisdiction should apply federal choice-of-law principles or those of the forum state. *In Re Mirant Corp.*, 675 F.3d 530, 536 (5th cir. 2012); *In Re Brown*, 521 B.R. 205, 228 (Bankr. S.D. Tex 2014). And other circuits have split on the issue.

To determine what state's law to apply in bankruptcy cases, some courts apply federal common law, asking which state has the most significant contacts to the case. *Lindsay v. Beneficial Reinsurance Co.*, 59 F.3d 942, 948 (9th Cir. 1995); *SMEC*, 160 B.R. at 91. Courts applying the most-significant-contacts test rely on dicta from *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156 (1946). There, the Supreme Court said, "What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed, is a question which, in the absence of overruling federal law, is to be determined by reference to state law." But the Supreme Court recognized also that

> obligations . . . often have significant contacts in many states so that the question of which particular state's law should measure the obligation seldom lends itself to simple solution. In determining which contact is the most significant in a particular transaction, courts can seldom find a complete solution in the mechanical formulae of the conflicts of law. Determination requires the exercise of an informed judgment in the balancing of all the interests of the states with the most significant contacts in order best to accommodate the equities among the parties to the policies of those states.

*Id.* at 161–62. Again, this is just dicta; in *Vanston*, the Supreme Court did not actually have to make a choice of law. Courts have nonetheless taken *Vanston* to indicate that courts sitting in bankruptcy should apply their independent judgment when resolving conflicts of state law. *See, e.g.*, *SMEC*, 160 B.R. at 89–90. One such court has reasoned that forum states lack the interest in having their laws applied in bankruptcy cases that they have in diversity cases. *Id.* at 90. Indeed, the location of a debtor when it files for bankruptcy may have little relation to the location of its property and

dealings. *Id.* Because debtors could have property dispersed among the states, federal courts should apply the law(s) of the state(s) with the greatest interest in the proceeding. *Id.* Another argument in favor of applying federal rules is that it prevents forum shopping by removing the incentive for debtors "in the shadow of bankruptcy" to relocate so as to take advantage of a particular forum's laws in a way that would subject creditors to laws of states in which they never transacted. *Id.* at 90–91.

Other courts sitting in bankruptcy apply the forum state's choice-of-law rules. *See, e.g.*, *In Re Merritt Dredging Co.*, 839 F.2d 203, 206 (4th Cir. 1988) ("[I]n the absence of a compelling federal interest which dictates otherwise, the *Klaxon* rule should prevail where a federal bankruptcy court seeks to determine the extent of a debtor's property interest."). One such Court applying the forum state's choice-of-law rules reasoned that a uniform rule under which the forum state's rules would always apply would enhance predictability. *Id.* Additionally, these courts say that applying the rules of the forum state accords with *Erie*[4] and *Klaxon's*[5] admonition that the federal courts should only apply federal law to federal issues and issues in which an important federal interest is at stake. *Id.* Without an important federal interest at stake when determining state-law property interests, applying one set of rules in diversity cases and another in bankruptcy cases would be anomalous. *Id.*

On this interesting question of what choice-of law principles to apply in bankruptcy cases, the Court concludes that it need not resolve the issue because the end result is the same. The Fifth

---

[4] In the seminal case *Erie R.R. Co. v. Tompkins*, the Supreme Court held that "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." 304 U.S. 64, 78. In so holding, the Supreme Court overruled *Swift v. Tyson*, in which the Supreme Court applied "general principles of commercial law" to resolve a diversity case rather than any state's law. 41 U.S. 1, 18 (1842). *Erie* put to rest the notion of "federal general common law." *Erie*, 304 U.S. at 78.

[5] Relying on *Erie*, the Supreme Court held in *Klaxon* that federal courts sitting in diversity apply the choice-of-law rules of the forum state. 313 U.S. at 496.

Circuit has generally avoided the issue in cases in which federal and forum-state choice-of-law rules produce the same result, emphasizing that the Supreme Court and the Fifth Circuit "have taken care to avoid resolving this question ." *Woods-Tucker Leasing Corp. of Ga. v. Hutcheson-Ingram Dev. Co.*, 642 F.2d 744, 748 (5th Cir. 1981); *see also Fahs v. Martin*, 224 F.2d 387, 399 (5th Cir. 1955) ("[W]e conclude that if we applied a federal rule or if we determined what result the courts of Florida would reach, the answer would be the same. We do not determine which road the trial court should have travelled [*sic*] to arrive at the common destination."). And the Fifth Circuit has not decided a bankruptcy case in which the outcome of applying state and federal choice-of-law rules would have differed.[6] Thus, rather than determine whether to apply federal or state choice-of-law rules, the Court will instead show that the result would be the same under either.

Under Texas law, the law of the states in which BFN received the products from the Nurseries applies. "While farm products are in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of an agricultural lien on the farm products." Tex. Bus. & Com. Code § 9.302. Farm products include "goods, other than standing timber, with respect to which the debtor is engaged in a farming operation which are . . . crops grown, growing, or to be grown, including . . . crops produced on trees, vines, and bushes." Tex. Bus. & Com. Code § 9.102(a)(34). And an agricultural lien is

---

[6] Though, the Fifth Circuit has stated, "In this federal bankruptcy case the District Court is not obliged to use the choice-of-law methodology of the forum state." *Wallace Lincoln-Mercury Co. v. Gentry*, 469 F.2d 396, 400 n.1 (5th Cir. 1972). But this is just dicta in a footnote. Additionally, the rule of orderliness requires the Court to follow an earlier panel opinion until it is overruled by the *en banc* Fifth Circuit or the Supreme Court. *Jacobs v. Nat. Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008). Because neither has overruled *Fahs*, decided in 1955, the Court will follow *Fahs* and avoid deciding whether state or federal rules apply. The Fifth Circuit has done the same. *See Mirant*, 675 F.3d at 536 (declining to decide whether state or federal rules applied).

> an interest in farm products . . . that secures payment or performance of an obligation for . . . goods or services furnished in connection with the debtor's farming operation . . . that is created by statute in favor of a person that . . . in the ordinary course of business furnished goods or services to a debtor in connection with a debtor's farming operation . . . whose effectiveness does not depend on the person's possession of the personal property.

Tex. Bus. & Com. Code § 9.102(a)(5).

Here, the Nurseries sold BNF various plants that are clearly farm products under Texas law. Doc. 29-1, Stipulation, Ex. 1; Doc. 29-2, Stipulation, Ex. 2; Doc. 29-3, Stipulation, Ex. 3; Doc. 29-4, Stipulation, Ex. 4. And the Nurseries' liens on those goods were clearly agricultural liens. Thus, Texas law would require the Court to apply the law of states to which the Nurseries shipped the products to determine whether the Nurseries' liens are senior to PNC's and enforceable.

Applying federal choice-of-law rules leads to the same result. Under federal rules, federal courts apply the substantive law of the state with the most significant contacts to the case. *See Mirant*, 675 F.3d at 536 (referring to federal choice-of-law test as the "most significant relationship approach" (quoting Restatement (Second) Conflict of Laws § 6 (1971) (internal quotations omitted))); *Brown*, 521 B.R. at 228 ("Under federal conflict of law principles, the law of the state with the most significant contacts applies." (citing *Vanston*, 329 U.S. at 161–62)). The federal test is "synonymous with the 'most significant relationship' approach adopted by [§ 6]" of the Restatement (Second) Conflict of Laws. *Mirant*, 675 F.3d at 536. The Restatement says,

> The validity and effect of a security interest in a chattel as between the immediate parties are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the parties, the chattel and the security interest under the principles stated in § 6.

Restatement (Second) Conflict of Laws § 251(1) (1971). Section 6 states in turn that, when there

is no statutory[7] directive, courts should consider the following factors when determining what state's law to apply:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of the other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

*Id.* This list of factors is non-exhaustive. *In Re Cyrus II P'ship*, 413 B.R. 609, 615 (Bankr. S.D. Tex. 2008); Restatement (Second) Conflict of Laws § 6 cmt. c.

In the secured-transaction context, the location of property strongly suggests which state's law should govern lien perfection and priority. Because all but one state have adopted the UCC, the Fifth Circuit considers the UCC part of "the federal law of commerce—including secured transactions." *Woods-Tucker*, 642 F.2d at 749. And the UCC says, "While farm products are in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of an agricultural lien on the farm products." U.C.C. § 9-302 (Am.

---

[7] Section 6 actually says "state" directive. PNC seizes on the Restatement's use of the word "state," arguing that even when applying federal choice-of-law principles, a court must apply statutory choice-of-law rules of the forum state. PNC is incorrect. No courts applying federal choice-of-law principles have followed PNC's approach; federal courts applying federal-choice-of law rules do not necessarily follow statutory directives of the forum state. Interpreting § 6 as PNC does would eliminate the possibility that federal choice-of-law rules even exist because, under PNC's interpretation, a federal court applying federal choice-of-law rules would be bound to follow the choice-of-law rules of the forum state. But the Fifth Circuit has recognized that federal choice-of-law rules exist and that these rules require federal courts to apply their independent judgment. *Mirant*, 675 F.3d at 536. The better interpretation of § 6 is that, for federal-court cases, "state" refers to the United States. *Vanston* supports this interpretation because it states that federal courts should apply their independent judgment to determine which state's law applies when federal law does not direct courts to apply a particular state's laws. *Vanston*, 329 U.S. at 161–62.

Law Inst. & Unif. Law Comm'n 1977).

Thus, the Court will take the UCC's approach as the starting point for determining which states' laws apply in this case—just as the Fifth Circuit has. In *Woods-Tucker*, the Fifth Circuit declined to decide what choice-of-law rules to apply in a bankruptcy case. 642 F.2d at 748–49. In showing that Texas and federal rules would produce the same result, the Fifth Circuit followed a UCC choice-of-law rule identical to a statutory directive of the forum state. *Id.*

The Restatement also generally supports the UCC's approach in lien-dispute cases. Indeed, § 251 of the Restatement states, "In the absence of an effective choice of law by the parties, greater weight will usually be given to the location of the chattel at the time that the security interest attached than to any other contact in determining the state of the applicable law." Restatement (Second) Conflict of Laws § 251(2) (1971).

The § 6 factors also support the UCC's approach. *Id.* § 6(2). As to factors (a) and (e), preferring the law of the state in which property is located serves the interstate system of secured transactions and the policies underlying secured-transaction law. *See Woods-Tucker*, 642 F.2d at 749 (referring to widespread adoption of UCC by states as "part of a national effort to establish a nationally uniform law to govern the validity and effect of commercial transactions"). Credit can more easily be extended on an interstate basis when creditors can easily determine the extent to which collateral offered by potential debtors is already encumbered by liens. And creditors can most easily determine the extent to which collateral is encumbered when they need only look to the law of the state in which collateral is located. *Mirant*, 675 F.3d at 538 (choosing to apply the law of a state because the state had adopted an approach many other states had adopted and noting that applying that state's law would serve the Restatement's goal of uniformity of result).

Factor (b), which directs courts to consider the policies of forum states, also supports the UCC's approach. The forum state has no special interest in applying its laws to lien disputes brought in its borders just because it is the forum state. The property at issue would not necessarily be in the state in which a case is brought. And a state has little interest in regulating property that sits in another state. Rather, states in which property subject to competing liens is located have the strongest interest in applying their laws in lien cases, which brings the Court to factor (c). Because states generally have strong interests in determining interests in property in their borders, the third factor strongly supports the UCC's position. *See* Restatement (Second) Conflict of Laws § 6 cmt. f (1971); *Id.* § 251(2).

Restatement factor (d) favors a choice of law that protects parties expectations. The UCC's approach protects parties expectations because almost every state has adopted at least part of its secured-transactions article, *In Re King Porter*, 446 F.2d 722, 732 (5th Cir. 1971),[8] which means most contracting parties would expect their liens to be governed by the laws of states where encumbered property is located. Essentially, the UCC approach is the norm. For the same reasons, factor (f), which pertains to the predictability, certainty, and uniformity of the result, supports the UCC approach. Applying the law of the state in which encumbered property is located is simply an easy rule to apply—and predictable at that.

Finally, as to factor (g), applying the law of the state where property is located would be relatively simple. Restatement (Second) Conflict of Laws § 6(2)(g) (1971). Mostly, the UCC will govern, and lien priority and perfection rules are generally statutory, mechanical, and clear. Thus,

---

[8] *See also LII, Uniform Commercial Code Locator*, https://www.law.cornell.edu/uniform/ucc (listing states that have adopted parts of the UCC).

the Restatement supports the UCC's approach to choosing what law to apply in lien cases, so, in the Court's independent judgment, the law of states in which the encumbered property is located will govern the priority of the competing liens in this case—just as it would under Texas law.

The Nurseries incorrectly contend that the contracts between Fishback[9] and BNF require the Court to apply Oregon law to all of the property in this case. Doc 31. Nurseries' Mot. Summ. J. Br., 7–8; Doc. 39-1, Nurserie's Summ. J. Resp. Br., 8. The contracts state, "All matters regarding these transactions shall be governed by Oregon law including but limited to ORS 87.700 et seq." Doc. 29-1, Stipulation, Ex. 1; Doc. 29-2, Stipulation, Ex. 2; Doc. 29-3, Stipulation, Ex. 3. But Courts generally do not enforce choice-of-law provisions against parties who do not agree to them,[10] including third-party creditors in lien disputes like this one.[11]

Nor does the UCC allow for parties to contract around the UCC's choice-of-law rules for agricultural products. The UCC states, "If one of the following provisions of [the Uniform Commercial Code] specifies the applicable law, that provision governs and a contrary agreement is effective only to the extent permitted by the law so specified: . . . Sections 9-301 through 9-307." U.C.C. § 1-301(c) (Am. Law Inst. & Unif. Law Comm'n 1977). Section 9-302 governs agricultural

---

[9] The Surface contracts contain no choice-of-law provision. Doc. 29-4, Stipulation, Ex. 4.

[10] *In Re Zuckerhorn*, 484 B.R. 182, 199 (B.A.P. 9th Cir. 2012); *Mfrs. Hanover Tr. Co. v. Frymire*, No. 86 C 2440, 1991 WL 274972, at *7 (N.D. Ill. Dec. 17, 1991); David Frisch, *Lawrence's Anderson on the Uniform Commercial Code* § 9-103:12 ("A third party cannot have his rights altered, compromised, or redefined by the provisions of a contract, including by a choice-of-law clause, that he has not accepted.").

[11] *See Carlson v. Tandy Comput. Leasing*, 803 F.2d 391, 394 (8th Cir. 1986); *In Re Doughty's Appliance, Inc.*, 236 B.R. 407, 411 (Bankr. D. Or. 1999); *In Re Eagle Enters.*, 223 B.R. 290, 294 (Bankr. E.D. Penn. 1998); David Frisch, *Lawrence's Anderson on the Uniform Commercial Code* § 1-106:67 (3d ed. 2017) ("A creditor is not bound by a choice-of-law provision when the creditor has not signed a contract so providing.").

liens and does not allow parties to contract around its choice of law rules. Thus, the choice-of-law provision in the Fishback contracts does not require the Court to apply Oregon law.

*B. The Merits of the Lien Dispute*

Michigan and Tennessee law govern the perfection and priority of liens on property the Nurseries shipped to BNF in those states. Both Michigan and Tennessee require a creditor to file a financing statement to perfect a lien. Mich. Comp. Laws § 440.9310(1); Tenn. Code Ann. § 47-9-301(a). The financing statement must list the name of the debtor. Mich. Comp. Laws § 440.9502(1); Tenn. Code Ann. § 47-9-502(a). A debtor's name is the name listed on the document creating the entity filed in the state under the laws of which the debtor was created. Mich. Comp. Laws § 440.9503(1)(a); Tenn. Code Ann. § 47-9-503(a)(1). However, both states have also a savings clause under which an incorrect debtor name will not invalidate a financing statement if, and only if, a search using the debtor's correct name would produce the financing statement with the incorrect debtor name. Mich. Comp. Laws § 440.9506(2); Tenn. Code Ann. § 47-9-506(b), (c).

Here, the Nurseries failed to include the correct debtor name on the financing statements they filed in Michigan and Tennessee. The debtor's name is BFN Operations LLC. Doc. 35-19, App'x to PNC's Mot. Summ. J., 444–45. But the Nurseries' Michigan and Tennessee financing statements list the debtor as BFN Operations, LLC abn Zelenka Farms. Doc. 29-2, Stipulation, Ex. 2; Doc. 29-3, Stipulation, Ex. 3; Doc. 29-4, Stipulation, Ex. 4. Thus, the Nurseries' financing statements incorrectly listed the debtor's name.

And the states' savings clauses do not save the Nurseries. PNC conducted searches of Michigan and Tennessee records using the name BFN Operations LLC but did not find the Nurseries' financing statements. Doc. 35-20, App'x to PNC's Mot. Summ. J., 446–47; Doc. 35-21,

App'x to PNC's Mot. Summ. J., 452–54; Doc. 35-22, App'x to PNC's Mot. Summ. J., 470. That is because the search logic Michigan and Tennessee use is not inclusive in the way, say, Google's is. Mich. Admin. Code r. § 440.509; Tenn. Comp. R. & Regs. § 1360-08-05.04. Michigan and Tennessee detail their filing systems' search logics, and neither state provides for inclusivity. Mich. Admin. Code r. § 440.509; Tenn. Comp. R. & Regs. § 1360-08-05.04. In other words, although Google would produce records under "BFN Operations, LLC abn Zelenka Farms" from a search for "BFN Operations LLC" because the former includes the latter, a search of Michigan and Tennessee's databases would not because their search logic does not return a result just because the search term is included in the result.

Because the Nurseries failed to file effective filing statements in Michigan and Tennessee, they lack perfected liens as to goods they sent to BNF in those states. And because the Nurseries lack perfected liens on goods shipped to Michigan and Tennessee they have no "valid, enforceable, properly perfected, and unavoidable pre-petition liens" on property shipped to Michigan and Tennessee senior to PNC's lien. Thus, the Court **GRANTS** PNC's motion for summary judgment and **DENIES** the Nurseries' motion as to goods the Nurseries sent to BNF in Michigan and Tennessee.[12]

Fishback also sent products to BFN in Oregon. Doc. 29-1, Stipulation, Ex. 1. Oregon law governs lien perfection and priority as to these products. Under Oregon Law, an "[a]n agricultural producer that delivers or transfers agricultural produce for consideration to a purchaser has a lien for

---

[12] PNC argued also that the Nurseries untimely filed their financing statements in Michigan and Tennessee. Doc. 34, PNC's Mot. Summ. J. Br., 17. But because the Nurseries' failure to include BNF's correct name on their Michigan and Tennessee financing statements rendered those financing statements defective, the Court need not address PNC's timeliness argument.

the contract price of that produce." Or. Rev. Stat. § 87.705(1). And the lien attaches on the date the purchaser takes physical possession of the produce. *Id.* An agricultural producer need not file any notice to perfect a lien under 87.705. *Id.* § 87.705(2).

A lien created under 87.705 "expires no later than the end of the 45th day after the date that the final payment to the agricultural producer is originally due, unless the producer extends the lien." *Id.* § 87.710(1). A producer may extend a lien by filing a notice of lien or a notice of claim of lien between the date final payment is due and the end of the 45th day after the date final payment is due. *Id.* § 87.710(1), (2). As to the content of the notice of lien,

> The notice must be supported by affidavit and contain:
>
> (a) A true statement of the agricultural producer's demand after deducting all credits and offsets;
>
> (b) The name of the purchaser that received the agricultural produce to be charged with the lien;
>
> (c) A description of the produce delivered or transferred by the producer sufficient to identify the basis for the lien;
>
> (d) A statement that the amount claimed is a true and bona fide existing debt as of the date of the filing of the notice of lien;
>
> (e) The date that the final payment to the producer was originally due; and
>
> (f) Such other information as the Secretary of State may require.

*Id.* § 87.710(2). If a producer files a notice, "the lien expires no later than the 225th day after the

date that the final payment to the producer is originally due." *Id.* § 87.710(1).[13]

Here, Fishback failed to extend its lien beyond the initial forty-five-day period. The date of Fishback's invoice pertaining to goods delivered to BFN in Oregon is March 29, 2016. Doc. 29-1, Stipulation, Ex. 1. March 29 is also the original due date for payment. Doc. 29-1, Stipulation, Ex. 1. Payment became finally due on June 27, 2016, Doc. 29-1, Stipulation, Ex. 1, and payment was forty-five days past due on August 11, 2016. Though Fishback had to file a notice of lien to extend its lien on August 11, 2016, Fishback did not file the appropriate notice until August 29, 2016—after the deadline set by Oregon law. Doc. 29-9, Stipulation, Ex. 9A.

But Fishback claims that its failure to timely file the notice of lien does not keep its lien from being enforceable. Doc. 43, Nurseries' Rep., 6. Fishback highlights that it filed a UCC financing statement regarding the goods shipped to BFN in Oregon on July 13, 2016—before the deadline for filing a notice of lien. According to Fishback, the UCC financing statement serves as a notice of lien under Oregon's doctrine of substantial compliance. Doc. 29-1, Stipulation, Ex. 1.

Fishback's substantial-compliance argument fails. In Oregon, "[s]ubstantial compliance requires compliance in respect to the essential matters necessary to assure every reasonable objective of the statute." *Rogers v. Roberts*, 717 P.2d 620, 622 (Or. 1986) (quoting *Sabatini v. Jayhawk Constr. Co.*, 520 P.2d 1230 (Kan. 1974)). "What constitutes substantial compliance with a statute is a matter depending on the facts of each particular case." *Id.* (quoting *In Re Santore*, 623 P.2d 702 (Wash. 1981)). In determining whether a litigant has substantially complied with a statute, Oregon courts consider "degree of non-compliance with the letter of the statute, the policy which underlies

---

[13] A creditor can extend a lien also by filing a notice of lien under Or. Rev. Stat. § 87.242. But § 87.242's requirements match § 87.710's.

the particular statutory provision in question, and the prejudice which may have resulted to either the owner of the property or other third parties." *McGregor Co. v. Heritage*, 631 P.2d 1355, 1357 (Or. 1981).

Oregon's substantial-compliance doctrine does not make Fishback's UCC financing statement a substitute for the notice of lien. Oregon law requires a lien holder to file to extend a lien beyond 45 days after the final-payment due date. First, Fishback's degree of noncompliance was high. Oregon law specifically requires a notice of lien from persons who want to extend a lien. Or. Rev. Stat. § 87.710(1), (2). Oregon law provides also for the filing of UCC financing statements like the one Fishback filed. *Id.* § 79.0502. But though Oregon statutes make UCC financing statements relevant to priority disputes, *id.* § 79.0322(1)(a), Oregon requires a different notice to extend a lien, *id.* § 87.710(1), (2). Oregon's legislature would not have provided for both filings if either could pull double duty. Moreover, notices of liens contain information UCC financing statements need not contain under Oregon law and that Fishback's financing statement did not contain. *See id.* § 87.710(2) (notice-of-lien contents); *id.* § 79.0502(1) (financing-statement contents); Doc. 29-1, Stipulation, Ex. 1 (Fishback's financing statement). Fishback's financing statement is not supported by an affidavit, Or. Rev. Stat. § 87.710(2), and it lacks a "statement that the amount claimed is a true and bona fide existing debt as of the date of the filing of the notice of lien," § 87.710(2)(d). Nor did Fishback use the form required by the Secretary of State, which Oregon law required Fishback to use. *Id.* § 87.736(1); Or. Admin. R. 160-050-0110; Or Admin. R. 160-050-0130(4).

The policy underlying Oregon's lien system and prejudice that would result to third parties from allowing UCC statements to serve as notices of liens also support finding that Fishback has not substantially complied with the statute. Although one purpose of Oregon's lien system undoubtedly

is to protect creditors like Fishback, another purpose is to enable people to discover whether property is encumbered by liens. *Cf. Comm. Bank v. Jones*, 566 P.2d 470, 483 (Or. 1977) (noting that the aim of Oregon's secured-transaction laws is to "provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and with greater certainty"). Allowing UCC financing statements to double as notices of liens, would reduce certainty because, though a UCC financing statement may indicate that the property described by the statement is subject to a lien, a financing statement tells a viewer nothing about the duration of the lien. *See* Or. Rev. Stat. § 87.710(1) (stating that an agricultural lien lasts for forty-five days unless extended via the filing of a notice of lien). The only reason a person would file a notice of lien under § 87.710, however, would be to extend her lien. Thus, whereas a UCC financing statement tells a viewer nothing about a liens duration, a notice of lien tells viewers that a creditor has extended her lien. Allowing a financing statement to serve as a notice of lien would therefore, keep people from determining whether liens have been extended.

Letting UCC financing statements pull double duty is prejudicial to third parties for largely the same reasons. Searchers of Oregon's lien index cannot determine the duration of a lien just by looking at a financing statement.

Thus, because Fishback failed to comply substantially with Oregon law, any lien Fishback had under Oregon law expired and is therefore unenforceable. The Court therefore **GRANTS** PNC's motion for summary judgment as it applies to goods the Nurseries sent to Oregon and **DENIES** the Nurseries' motion as to the same.

## IV.

## CONCLUSION

The Court **GRANTS** PNC's motion for summary judgment and **DENIES** the Nurseries' motion. The Court thus **DECLARES** that the Nurseries lack "valid, enforceable, properly perfected, and unavoidable pre-petition liens that are senior to the liens granted to Pre-Petition Lenders, Pre-Petition Agent, and Term Loan Agent pursuant to the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents" and **ORDERS** that the Nurseries **TAKE NOTHING** on their turnover claim.

**SO ORDERED.**

**SIGNED: December 19, 2017**.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE